UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

SIG SAUER, INC.,

       Plaintiff

    v.

JEFFREY S. BAGNELL, ESQ., LLC,
and JEFFREY S. BAGNELL

       Defendants.

CIVIL ACTION NO. 1:22-cv-00078

**OPPOSITION OF DEFENDANTS
JEFFREY S. BAGNELL, ESQ., LLC AND JEFFREY S. BAGNELL
TO PLAINTIFF'S MOTION FOR PRELIMNARY INJUNCTION**

Joseph M. Cacace (NH Bar # 266082)
Max. D. Stern (*pro hac vice*)
Howard M. Cooper (*pro hac vice*)
Lorraine Belostock (*pro hac vice*)
jcacace@toddweld.com
mstern@toddweld.com
hcooper@toddweld.com
lbelostock@toddweld.com
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 277-577

*Counsel for Defendants Jeffrey S. Bagnell,
Esq., LLC, and Jeffrey S. Bagnell*

Dated: April 15, 2022

## INTRODUCTION

This lawsuit is an example of a most problematic strategy: defending by suing opposing counsel and seeking to silence him with an order that violates his fundamental and protected free speech and petitioning rights. This type of bare-knuckled tactic should not be encouraged.

Jeffrey Bagnell is a solo practitioner based in Connecticut, where he operates his firm, Jeffrey S. Bagnell, Esq., LLC ("Bagnell Firm," together "Bagnell"). Bagnell Aff. ¶1. SIG Sauer, Inc. ("SIG") is the manufacturer of the P320 semi-automatic pistol. Compl. ¶11. Since the firearm was first introduced in 2014, there have been well over 70 reported incidents of it discharging without a trigger pull and numerous lawsuits have been filed against SIG. Bagnell Aff. ¶31-39. In 2017 Mr. Bagnell was retained to represent a Stamford, Connecticut police officer whose SIG P320 pistol shot him in the knee when it was dropped from a height of approximately three feet, causing serious injury. *Id.* ¶14-20. Following that case, he has become involved in some 15 lawsuits against SIG, including two in this Court,[1] and is a leading critic of the safety of the weapon. *Id.* ¶5-6. He has appeared on Good Morning America, Nightline, CNN, and a host of other media outlets to warn of the danger that this popular firearm – there are about 2 million in circulation, many with law enforcement officers – may fire without its trigger being pulled, a danger not only to the owner of the weapon, but to the surrounding public. *Id.*

The *Guay* case, in which Mr. Bagnell appears as lead counsel, is now scheduled for trial on July 19 of this year. That trial was scheduled the same day SIG filed this lawsuit. *Id.* ¶8.

In 2020, in anticipation of upcoming trials, Mr. Bagnell retained a company specializing in forensic animations to create a demonstrative to be used at trial to depict his theory of how an untriggered firing can occur in a P320 (the "Animation"). *Id.* ¶40. After the Animation was

---

[1] *Guay v. Sig Sauer, Inc.*, 1:20-cv-00736-LM (D.N.H.); *Schneider v. Sig Sauer, Inc.*, 1:20-cv-01190-LM (D.N.H.).

completed, in August 2021, Mr. Bagnell decided in addition to upload it to the internet, believing that this was warranted by the danger the weapon posed to the public. *Id.* ¶89-90.

 SIG now seeks to ban Mr. Bagnell from publishing his animation "on any platform." Proposed Injunction (Doc. No. 3-2 at 2.) SIG was well aware of the Animation for over six months before filing this lawsuit and preliminary injunction motion. Compl. ¶16. During that time, the Animation was viewed over 36,000 times, according to SIG's research. *Id.* But rather than taking any action before now, it chose to wait until the day that the *Guay* case was set down for trial in this Court, the very time when preparation and pre-trial motion practice is at its most intense. Such a trial will otherwise fully and fairly ventilate all the key questions about the safety of the weapon, applying the venerable fact-finding tools of a full-dress jury trail conducted after discovery. Not satisfied with this traditional means of finding the facts, SIG seeks to suppress the Animation from being published "on any platform," based on what it proposes to be a non-jury finding that it is "likely" to succeed in showing that Mr. Bagnell's theory – as depicted in the Animation – is "willful[ly]" false. Mem. at 11 (Doc. No. 3-1.)

 Moreover, SIG's intent is not only to put Mr. Bagnell on his heels in the upcoming case but, according to the press release it issued along with the filing, its purpose is "to ensure that Mr. Bagnell is not allowed to continue deceiving the public about the safety of the P320." *Id.* ¶117 & Ex 9. SIG's strategy is to divert Mr. Bagnell from his task of preparing for trial, make it necessary for him to prove his case months before he is ready, expose his work product in ways that could never be allowed in the underlying cases, commit the finding of facts to the highly foreshortened procedure appropriate for provisional remedies, exhaust his resources, diminish his reputation, requiring him to defend his good name, and deliver a healthy dose of intimidation.

This Court should not allow its normal civil justice process to be short circuited, not only because it would be unfair, but because SIG's motion papers are pervaded by errors of fact, law, and logic.[2]

## ARGUMENT

SIG seeks a preliminary injunction on three claims: False advertising under the Lanham Act (Count I); Defamation (Count II); and Unfair Competition under New Hampshire law (Count III). On a motion for preliminary injunction, "a district court typically must consider four elements: [1] the probability of the movant's success on the merits, [2] the prospect of irreparable harm absent the injunction, [3] the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does), and [4] the effect of the court's action on the public interest." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). SIG has the burden of proving all of these elements. It satisfies none of them.

### I.    This Court Lacks Personal Jurisdiction Over the Defendants

The Complaint alleges that Bagnell resides in Connecticut, where he is licensed to practice law, and where he operates the Bagnell Firm. Compl. ¶¶ 6-7. SIG alleges that Bagnell posted the Animation to his firm's website and to YouTube from Connecticut—*not* from New Hampshire. *Id.* ¶¶ 7-8, 15-16. SIG does not allege that *any* of its existing or potential customers in New Hampshire even observed the Animation, much less decided not to purchase a SIG gun after viewing it. Instead, the *only* connection to New Hampshire alleged in the Complaint is that SIG's headquarters is there and the "statements [at issue] are targeted at SIG by name and impact SIG in New Hampshire." *Id.* ¶¶ 5, 8; *see also* Bagnell Aff. ¶9.

---

[2] Defendants direct the Court's attention to the following affidavits and exhibits submitted to the Court in support of this Opposition: Affidavit of Jeffrey S. Bagnell; Affidavit of Peter Villani; and Affidavit of Timothy M. Hicks, P.E.

SIG cannot meet its burden to establish personal jurisdiction. *See Daynard v. Ness, Motley, Loadhold, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002).[3] SIG must establish that (1) the claims in the litigation "arise out of, or relate to" the Defendants' New Hampshire activities, (2) the defendants purposefully availed themselves of the privilege of conducting activities in New Hampshire, thereby making a lawsuit in New Hampshire "foreseeable," and (3) the exercise of jurisdiction is reasonable. *PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 17 (1st Cir. 2019). It is not sufficient that SIG was allegedly harmed in New Hampshire. It is the *defendants'* (non-existent) contacts with New Hampshire (not the Plaintiff's) that are relevant. *See Walden v. Fiore*, 571 U.S. 277, 284-86 (2014).[4]

There is no allegation that Mr. Bagnell directed the Animation at New Hampshire in any way. Rather, the allegation is that he posted the Animation on YouTube and on the firm's website, where it was available for anyone to view from anywhere on earth. Nor can Bagnell's representation of clients in two cases against SIG in federal court in New Hampshire confer personal jurisdiction because they do not arise out of or relate to the pending two cases. While it is true that this lawsuit disrupts Mr. Bagnell's prosecution of those cases, SIG does not allege that as a basis for jurisdiction. Nor could it. Bagnell is "absolutely privileged from liability in civil actions" for statements made in the course of judicial proceedings. *Pickering v. Frink*, 461 A.2d 117, 119 (1983); *Crowley v. F.D.I.C.*, 841 F. Supp. 33, 40 (D.N.H. 1993). Moreover, SIG's claims here arise out of and relate *only* to Bagnell posting the Animation on the internet from Connecticut, which made it available everywhere. His representation of clients in New

---

[3] SIG does not, because it could not, claim that the Court has general jurisdiction over the Defendants. *See Daimler AG v. Bauman*, 571 U.S. 117 (2014). Instead, SIG alleges that the Court has specific jurisdiction.

[4] *Calder v. Jones*, 465 U.S. 783 (1984), and *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770 (1984), do not change the result because those cases involved wide-ranging and deliberate contact with the forum states, including wide circulation of print publications in the forum states and reliance on sources inside the forum.

Hampshire federal court therefore cannot be the basis of personal jurisdiction. *See, e.g.*, *Armtech Ins. Servs., Inc. v. Georgia Farm Servs., LLC*, No. 5:08-CV-151-C ECF, 2008 WL 11429744, at *3 (N.D. Tex. Dec. 19, 2008) (filing a lawsuit does not subject a party to personal jurisdiction in another lawsuit unless both cases arise from the same transaction or occurrence).

In sum, SIG's only allegation in support of jurisdiction—that *SIG* is located in New Hampshire—is plainly insufficient to establish personal jurisdiction. *See Scottsdale Cap. Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 22 (1st Cir. 2018) (no personal jurisdiction where "offending articles appear to have never been read by anyone" in New Hampshire); *McBee v. Delica Co.*, 417 F.3d 107, 124 (1st Cir. 2005) (mere fact that website that "is visible in a forum . . . is not enough, by itself, to subject a defendant to personal jurisdiction in that forum."); *ICP Solar Techs., Inc. v. TAB Consulting, Inc.*, 413 F. Supp. 2d 12, 19 (D.N.H. 2006) ("passive Web site . . . is not grounds for the exercise of personal jurisdiction").[5]

## II.     SIG Will Not Succeed on the Merits of Its Claims

### A.  Sig will not succeed in proving that the Animation contains material false and misleading statements or representations of fact.

To evaluate SIG's allegations that the Animation contains "material" "false and misleading statements or representations of fact" and that SIG "is likely to be injured as a result," Compl., ¶¶34, 35. 38, the Court must first identify what the Animation states or represents and then which statements or representations SIG alleges to be false. The Animation depicts the following: (1) a P320 firing a round without the trigger being pulled (an "uncommanded" discharge); (2) particular components of the firearm having certain physical flaws; and (3) a

---

[5] SIG presumably filed this suit in New Hampshire, despite the lack of personal jurisdiction, to try to avoid the Connecticut anti-SLAPP statute since New Hampshire does not have one. *See* Conn. Gen. Stat. Ann. § 52-196a. A Connecticut court would undoubtedly dismiss this SLAPP suit under the Connecticut law (which this Court should do as well at the appropriate time). *See, e.g., Gifford v. Taunton Press, Inc.*, No. DBDCV186028897S, 2019 WL 3526461, at *11 (Conn. Super. Ct. July 11, 2019) (dismissing SLAPP suit).

resulting "mechanism of failure." Bagnell Aff. ¶60-88 & Ex. 8. None of these depictions is false.

### 1. Whether the Animation falsely represents that the P320 can fire without a triggered command?

Remarkably, SIG never alleges that an untriggered discharge cannot happen or has never happened. Nowhere in any of SIG's motion papers will the Court find any reference to the fact that this *has* actually occurred time and time again – more than 30 instances are listed in Mr. Bagnell's affidavit alone (Bagnell Aff. ¶31-39) – sometimes even when the gun is holstered and often resulting in serious injury. SIG ignores this embarrassing fact. It could not plausibly deny it. Indeed, in a press release issued shortly after Mr. Bagnell filed his first lawsuit against SIG in 2017, SIG admitted that "vibration" or "shock" can cause the safety mechanism to fail. Bagnell Aff. ¶15-16 & Ex. 1.

Accordingly, SIG's complaint boils down to two claims: (1) the components in the Animation do not have the exact dimensions, shape, and appearance of the actual component parts on a P320, and (2) the P320's failures are not caused by the particular mechanism shown, but by something else.

### 2. Whether it is false that the Animation does not depict the exact geometry, dimensions, and appearance of the components of an actual P320 and shows defects which are not found in the actual firearm.

SIG makes three arguments to the effect that the Animation does not provide an exact physical representation of the firearm.

First, SIG's expert, Robert "Buzz" Miller, states that the representations of the component parts in the Animation are not true to the exact shape or dimension of the actual firearm. Miller Aff. ¶12, 14-15, 24-31, 42-43. But the Animation is a visual illustration—a re-creation—of the mechanism by which certain P320s have fired without a trigger pull. The Animation is *not* a photo, or CT scan. It is *not*, and does not purport to be, an exact copy or scale

drawing of any particular P320. It shows a process – how a failure could happen. Bagnell Aff. ¶60-65, 69, 72, 87-88; Villani Aff. ¶5. That is the whole point of an animation. Even when offered as a demonstrative at trial, it is recognized that an animation "need not be exact in every detail." *See, e.g.*, *Clark v. Cantrell*, 529 S.E.2d 528, 537 (S.C. 2000). That does not make it "false." Courts often suggest that trial judges instruct the jury that an animation is "only a re-creation of the proponent's version of the event" and "it should in no way be viewed as the absolute truth," but "like all evidence, it may be accepted or rejected" by the jury. 529 S.E.2d at 537. If an animation can be admitted as a demonstrative in court—even where the recreation is not "exact in every detail"—then at least as much leeway must be afforded to an animation posted on the internet.[6]

Secondly, SIG complains that the Animation only depicts the original unmodified P320, rather than the version modified to add additional safety features and offered to owners as a voluntary redesign (which SIG calls an "upgrade"). Miller Aff. ¶13, 45, 47. It is correct that the Animation does not depict the redesigned gun, but this does not make it "false." The Animation does not purport to do so. It only depicts the original unmodified gun, of which about 400,000-500,000 remain in circulation. Bagnell Aff. ¶61-62, 96-102, 112. Of course, Mr. Bagnell was not required to make an animation of *both* the unmodified and redesigned P320, though he could have, because the same components have been known to fail at least as often, if not more so, in the redesigned P320. *Id.* ¶31; Villani Aff. ¶5-8; Hicks Aff. ¶3-9.

Third, Mr. Miller states that when he made a comparison with actual P320s, he did not observe the physical characteristics shown in the Animation, particularly certain "excess

---

[6] *Cf. SBA Towers II, LLC v. Town of Atkinson, N.H.*, No. CIV. 07-CV-209-JM, 2008 WL 4372805, at *14 (D.N.H. Sept. 19, 2008) (unreasonable for zoning board to reject photographic simulations where "the photo simulations were proffered to give the [board] a fair representation, not an exact model").

material" which the Animation shows was left on the surfaces of the safety components and which, Mr. Bagnell contends, could lead to the failure of the safety apparatus. Miller Aff. ¶13-23. This is a meaningless observation. Mr. Miller examined only three firearms provided to him by SIG, out of millions in circulation. *Id.* ¶9. This says nothing about whether these flaws ever occur. The point of the Animation is not that the fault occurs in *every* pistol. Rather the point is that it *can* happen and *does* happen, as shown by the photographs and observations included in the affidavits of Mr. Bagnell and his experts. *See* Bagnell Aff. ¶55-57, 103, 107; Villani Aff. ¶6-24 & Exs. 1&2; Hicks Aff. ¶5-9 & Exs. 1&2.

### 3. Whether the mechanism of failure portrayed by the Animation is materially false.

A "striker-fired" pistol, such as the P320, substantially differs from a traditional hammer-fired pistol. Bagnell Aff. ¶45. Instead of an external hammer which must be moved back, the P320 has an internal "striker" that is kept under constant tension – very much like a bow and arrow or crossbow – but is blocked by a component, called the "sear," which holds the striker in place, and which is backed up by a safety lock. *Id.* When the trigger is pulled, the sear and the safety lock move away; and with the blockages thus released, the tension automatically drives the striker to make impact with the back of the round; and the gun discharges. *Id.* **The simple, critical fact is that an uncommanded firing could not occur unless *for some reason* the safety apparatus in the pistol – which is specifically intended to prevent this from happening – is defeated.** Villani Aff. ¶5; Hicks Aff. ¶9.

The theory illustrated by the Animation is that the excess material left by the manufacturing process – excess material (which the Animation refers to as the "rollover condition") – can reduce the surface areas of the key components of the safety apparatus which must be in contact with each other, thus rendering them vulnerable to slip or to the striker

"walking off" the sear. Villani Aff. ¶7-8; Hicks Aff. ¶5-7; Bagnell Aff. ¶75, 84, 114. Mr. Miller

opines that this is "impossible." Miller Aff. ¶36-37. But Mr. Bagnell has produced evidence that

this is how the accidents happen. *See* Bagnell Aff. ¶55-57, 103, 107; Villani Aff. ¶6-24 & Exs.

1&2; Hicks Aff. ¶5-9 & Exs. 1&2.[7] And neither Miller nor SIG has offered any other

explanation for the defeat of the safety mechanism in so many cases, without which failure, the

mishaps – which SIG has not contested – could not occur. Even if it were true that the Animation

does not depict the precise modus of failure, the fact remains that the P320 safety apparatus can

and does fail for *some* reason. To succeed on this motion, SIG must provide some other cause for

the recurrent problem. It has not even attempted to do so.

Furthermore, even if the theory depicted in the Animation were not correct, it could not

be said to be material. SIG would have to show that the Animation's particular portrayal of the

mechanism of failure "would likely influence the purchasing decision of a consumer,"

Complaint, ¶35, even though it correctly represents that the weapon can fail without a trigger

pull. If there is any diminution in SIG's sales, it would be because of the uncontested fact that,

one way or the other, its safety mechanism is capable of failing—not because of the mechanism

of failure.

Finally, as discussed below, under all of SIG's legal theories, it must show that the

"false" representation is of a fact, not an opinion. Fundamentally, the Animation makes two

factual assertions: that some SIG P320s have fired without a trigger pull, and that excess material

has been found in some firearms where that occurred. The rest of the Animation is a depiction of

*how* that happens, based upon expert *opinions*. In other words, the Animation illustrates expert

*opinion* about the mechanism by which the P320 has fired without trigger pulls. That distinction,

---

[7] The videos included as Exhibits 3-6 of Mr. Villani's affidavit clearly show the excessive physical movement of the striker foot and the slide (which contains the striker), showing that Miller's "impossibility" argument is meritless.

between fact and opinion, is critical to all of SIG's claims.

### B. SIG's Lanham Act Claim is Unlikely to Succeed

#### 1. SIG Is Not Within the "Zone of Interests" Protected by the Lanham Act's False Advertising Provisions Because It Does Not Compete, Even Indirectly, With Bagnell

The Lanham Act's false advertising provision provides that:

> Any person who, on or in connection with any goods or services . . . **uses in commerce** any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . **in commercial advertising or promotion**, misrepresents the nature, characteristics, [or] qualities . . . of . . . another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B) (emphases added).

In *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 120, 129, 132-34 (2014), the Supreme Court held that "a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked'" and whose harm was proximately caused by the defendant's conduct. While the Court held that direct competition is not required, the plain language of the statute and Congress's stated intent make clear that both parties must compete in the same market for a plaintiff to come within the "zone of interests" protected by the Lanham Act.

As the *Lexmark* Court very clearly explained, "[i]dentifying the interests protected by the Lanham Act . . . requires no guesswork, since the Act includes an 'unusual and extraordinarily helpful,' detailed statement of the statute's purposes." *Id.* at 131. Pertinent here, that Congressional direction states that "[t]he intent of this chapter is . . . to protect persons engaged in such commerce against unfair **competition**." 15 U.S.C. § 1125 (emphasis added). Further elaborating during the same Term, the Court explained that "[t]he Lanham Act creates a cause of action . . . for competitors." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014);

*see also ThermoLife Int'l LLC v. Sparta Nutrition LLC*, No. CV-19-01715-PHX-SMB, 2020 WL

248164, at *6 (D. Ariz. Jan. 16, 2020); *ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*,

No. CV-18-04189-PHX-JAT, 2020 WL 122874, at *3 (D. Ariz. Jan. 10, 2020), *aff'd sub*

*nom. ThermoLife Int'l, LLC v. Am. Fitness Wholesalers, L.L.C.*, 831 F. App'x 325 (9th Cir.

2020) ("Plaintiff and Defendant are not in the same market, and are thus not in competition"

which is "fatal to [the] Lanham Act claim.").

"A competitive relationship . . . is necessary inasmuch as it gate-keeps *who* may

appropriately bring suit. This is especially true for realizing Congress's intent that the Lanham

Act protect persons engaged in [interstate] commerce against unfair competition." *Handsome*

*Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 256–57 (4th Cir. 2017)

(quotations omitted). "When companies are not direct competitors, competitive injuries can still

be found where companies are **involved in the same market** if that involvement puts them

within the 'zone of interest' of the Lanham Act." *ThermoLife Int'l LLC v. Aesthetic Distribution,*

*LLC*, No. CV-19-02048-PHX-DJH, 2020 WL 12581996, at *4 (D. Ariz. Jan. 7, 2020) (emphasis

added); *see also Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL

4583625, at *6 (D. Ariz. Aug. 10, 2020) ("Plaintiffs cannot show competitive injury as a result

of the fact that they do not vie for consumer dollars in the same market as Defendant").

SIG correctly cites *Lexmark* for the proposition that the parties in a false advertising case

need not be in **direct** competition with each other. *See* Mem. at 7 (Doc. No. 3-1). But the

decision does not support the view that no competition is required at all, as the case involved

only **indirect** competition in the ***same market***.[8] It did not hold that parties who are not even in

---

[8] Indeed, *all* the Lanham Act cases that SIG cites involved direct or indirect competition in the same market. *See*
*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 313 (1st Cir. 2002) (trade association of
cashmere manufacturers and member sued clothing manufacturer); *Clorox Co. Puerto Rico v. Proctor & Gamble*
*Com. Co.*, 228 F.3d 24, 28 (1st Cir. 2000) (laundry detergent makers); *Podiatrist Ass'n, Inc. v. La Cruz Azul De*

the same market as one another are within the "zone of interests" protected by the Lanham Act.

It is self-evident that SIG and the defendants do not compete in any way, even indirectly, in the same market. SIG is a gun manufacturer. Bagnell is a consumer advocate and lawyer whose practice involves representing individuals (often law enforcement officers) injured by SIG's poorly manufactured P320s that discharged without a trigger pull.[9] Therefore, SIG is outside the "zone of interests" protected by the Lanham Act and its false advertising claim fails.

## 2.  Even If SIG Were Within the "Zone of Interests" Protected by the Lanham Act, SIG's Claim Would Still Fail

To prove a false advertising claim, a plaintiff must demonstrate that: "(1) the defendant made a false or misleading description of fact or representation of fact **in a commercial advertisement** about his own or another's product; (2) the misrepresentation is material[, *i.e.*, likely to influence the purchasing decision]; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation." *Presby Env't, Inc. v. Advanced Drainage Sys., Inc.*, No. 13-CV-355-LM, 2014 WL 4955666, at *8 (D.N.H. Sept. 30, 2014) (McCafferty, J.) (quoting *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310-11 (1st Cir. 2002)).

---

*Puerto Rico, Inc.*, 332 F.3d 6 (1st Cir. 2003) (association of podiatrists sued health care benefits providers); *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785 (6th Cir. 2015) (professional employment organizations and owner sued former employee, competitors, and their owner); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175 (8th Cir. 1998) (makers of roach bait product); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802 (D. Minn. 2011) (manufacturer sued competitor and retail stores); *Am. Bd. of Internal Med. v. Salas Rushford*, No. 19-1943, 2021 WL 214268 (D.P.R. Jan. 20, 2021) (physician sued board granting professional certifications to physicians).

[9] *See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994) (quoting 135 Cong. Rec. H1216–17 (daily ed. April 13, 1989)) (examining legislative history and concluding that non-commercial speech, like statements "made by interested groups which may arguably disparage a company and its products," "would be judged by first amendment law . . . and not section 43(a) law"); *Wojnarowicz v. American Family Ass'n*, 745 F. Supp. 130, 142 (S.D.N.Y.1990) (Section 43(a) "has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, who is not engaged in marketing or promoting a competitive product or service").

### a. The Animation is Not False or Misleading

As explained above, the Animation is not false or misleading in any way. The factual

assertions in the Animation are true: some SIG P320s have fired without a trigger pull, and

excess material has been found in some firearms where that occurred. The rest of the Animation

is a depiction of expert *opinions* about *how* that happens. But only false or misleading

representations of fact are actionable under the Lanham Act; opinions are not. 15 U.S.C. §

1125(a)(1)(B); *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1121 (9th Cir. 2021).

### b. The Animation is Not Commercial Advertising

"To constitute 'commercial advertising' for purposes of the Lanham Act, . . . the

representation in question must '(a) constitute commercial speech (b) made with the intent of

influencing potential customers to purchase the speaker's goods or services (c) by a speaker who

is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the

consuming public in such a way as to constitute advertising or promotion.'" *Presby*, 2014 WL

4955666, at *8 (quoting *Podiatrist Ass'n v. La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 19 (1st Cir.

2003)); *see also Ariix*, 985 F.3d at 1115; *Gordon & Breach Sci. Pubs. S.A. v. Am. Inst. of

Physics*, 859 F. Supp. 1521, 1535–36 (S.D.N.Y. 1994).

"Commercial speech" is "expression related ***solely*** to the economic interests of the

speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,

447 U.S. 557, 561 (1980) (emphasis added); *see also Bolger v. Youngs Drug Prod. Corp.*, 463

U.S. 60, 66 (1983) (quotations omitted) ("the core notion of commercial speech" is "speech

which does no more than propose a commercial transaction"); *Ariix,*, 985 F.3d at 1117 ("the crux

is on whether . . . the economic benefit was the primary purpose for speaking"); *Gordon &

Breach*, 859 F. Supp. at 1533 (Lanham Act "directed only against false representations in

connection with the sale of goods or services").

In this case SIG is seeking to suppress the Animation (1) as it appears on the YouTube page, (2) on the website post, and (3) "on any platform" at any time or anywhere. None of these publications, actual or prospective, qualify as commercial speech. The Animation itself "cannot be characterized merely as [a] proposal[] to engage in [a] commercial transaction[]." *Bolger*, 463 U.S. at 66. Indeed, it is not an invitation to engage in a commercial transaction at all; it says *nothing* about Bagnell's services as a lawyer. It is only the representation of the discharge of a firearm.[10] Bagnell Aff. Ex. 8. Similarly, the YouTube post had nothing to do with the sale of Bagnell's legal services. It contained no invitation to retain legal services at all. To be sure, the Bagnell website does invite inquiries from potential clients, but the linked page on which the Animation lives, has no text at all about Bagnell's services as a lawyer beyond the generic links on the banner at the top of the page. *See* Doc. No. 3-6. Not every publication which contains advertising is commercial speech; if it were, the New York Times would not enjoy the robust First Amendment protection it famously possesses. The "reference to a specific product [or service]" on the Bagnell Firm's website where the Animation appeared "does not by itself render the" Animation "commercial speech." *Bolger,* at 66.

Certainly, Mr. Bagnell does need to be able to financially support his practice and his family. Nevertheless, even if he has "an economic motivation for [posting] the [Animation, that] would clearly be insufficient by itself to turn the materials into commercial speech." *Id.* at 67.[11]

---

[10] *See Propel PEO, Inc. v. Roach*, No. CV 6:19-3546-HMH-KFM, 2020 WL 4606551, at *7 (D.S.C. July 24, 2020), *report and recommendation adopted*, No. CV 6:19-3546-HMH-KFM, 2020 WL 4605227 (D.S.C. Aug. 11, 2020) (failure to state a claim for false advertising where "no allegation that the mailings promoted a good or service offered by the defendants or anyone else"); *SCO Grp., Inc. v. Novell, Inc.*, 692 F. Supp. 2d 1287, 1295 (D. Utah 2010) (press release not commercial speech where releases "do not attempt to market [defendant's] products in any way," but "merely challenge Plaintiff's claims of ownership to . . . [certain] copyrights" and infringement).

[11] *See Liberty Couns., Inc. v. Guidestar USA, Inc.*, No. 4:17CV71, 2018 WL 10323724, at *4 (E.D. Va. Jan. 23, 2018), *aff'd*, 737 F. App'x 171 (4th Cir. 2018) (notation on website that Southern Poverty Law Center deemed plaintiff a "hate group" was not commercial speech, even though defendant "advertised its subscription on the website because the notation itself did not propose a commercial transaction").

Moreover, when core non-commercial speech – such as political advocacy, "communication of information, the dissemination and propagation of views and ideas," *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980) – is "inextricably intertwined with commercial speech," the speech is entitled to the full protection of the First Amendment. *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988)). Thus, even if one purpose of publicizing the Animation were deemed commercial, that aspect is tightly woven into the fully protected purposes of advocating gun safety, warning of threats to public safety and engaging in the petitioning activity of litigating cases for clients raising the very issues illustrated in the Animation. *See, e.g.*, *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

### c. SIG Cannot Show Materiality, a Tendency to Deceive a Substantial Segment of Its Audience, or That It Would Likely Be Harmed by the Animation

Materiality, tendency to deceive the audience, and likely harm are related criteria. SIG cannot establish a likelihood of proving any at trial. As discussed above in Section II.A.3, SIG cannot establish materiality because it is the fact that the P320 *discharges without a trigger pull* that is material to consumers; the mechanism for *how* that dangerous condition occurs is not. For the same reason, the Animation is not "likely to cause confusion or to deceive consumers." *Cashmere*, 284 F.3d at 311. SIG cannot establish either "literal falsity" or a tendency to deceive. Therefore, SIG must show consumer deception, which it has not done. *Id.*[12] "Usually consumer deception is demonstrated through surveys, which establish that consumers were misled by the alleged misrepresentations." *Id.* at 313-14; *see also Clorox Co. Puerto Rico v. Proctor & Gamble Com. Co.*, 228 F.3d 24, 33 (1st Cir. 2000). SIG relies on nothing more than a few comments on Attorney Bagnell's YouTube channel, but, if anything, those comments demonstrate a *lack* of

---

[12] SIG is not entitled to a presumption of deception based on intentional deceit (*Cashmere*, 284 F.3d at 316) because the Defendants did not intend to deceive or mislead consumers; they intended to *accurately inform* consumers.

confusion and questions being raised about the Animation. *See* Mem. at 4-5, 11-12, 14 (Doc. 3-1). The lack of evidence of deception is fatal to SIG's claim.

Further, SIG's Complaint has no allegation of actual harm to it caused by the Animation. *See Cashmere*, 284 F.3d at 318 ("the aggrieved party must demonstrate that the false advertisement actually harmed its business"). There is no allegation of actual lost sales or revenue. That is insufficient under the Lanham Act. *See, e.g., ThermoLife Int'l LLC v. Sparta Nutrition LLC*, No. CV-19-01715-PHX-SMB, 2020 WL 248164, at *7 (D. Ariz. Jan. 16, 2020) ("ThermoLife does not allege that any licensees actually stopped licensing its patents. . . . Such factual allegations are certainly necessary to allege more than a conclusory claim of commercial injury."); *ThermoLife Int'l LLC v. Aesthetic Distribution, LLC*, No. CV-19-02048-PHX-DJH, 2020 WL 12581996, at *5 (D. Ariz. Jan. 7, 2020) ("The Court finds that Plaintiff's conclusory allegations of injury to sales or reputation are not sufficiently supported by alleged facts.").

### C.  SIG Is Not Likely to Succeed On Its Defamation Claim

#### 1.  SIG Cannot Prove Defamation Under New Hampshire Law

"To establish defamation, there must be evidence that [1] a defendant failed to exercise reasonable care in publishing, [2] without a valid privilege, [3] a false and defamatory statement of fact about the plaintiff to a third party." *Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.*, 635 A.2d 487, 492 (N.H. 1993); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (requiring at least negligence to prove defamation). SIG fails to meet these elements.

<u>*First*</u>, the Animation is true or substantially true, as explained above and in the accompanying affidavits, which is an absolute defense to a defamation claim. *See e.g., Thomas v. Tel. Publ'g Co.*, 929 A.2d 993, 1012–13 (N.H. 2007), *as modified on denial of reconsideration* (Aug. 29, 2007) ("substantial truth" defeats a defamation claim "as it is not necessary that every

detail be accurate").

*Second*, many of the assertions in the Animation are based upon expert opinion about the mechanism that causes the P320s to misfire without a trigger pull. "A statement of opinion is not actionable unless it may reasonably be understood to imply the existence of defamatory fact as the basis for the opinion." *Thomas v. Tel. Publ'g Co.*, 929 A.2d 993, 1015 (N.H. 2007), *as modified on denial of reconsideration* (Aug. 29, 2007); *Sindi v. El-Moslimany*, 896 F.3d 1, 14 (1st Cir. 2018). Here, the thrust of the Animation is to convey the opinion of firearms and engineering experts as to the mechanism that causes the P320 to fire without a trigger pull. Conveying those opinions is not actionable.

*Third*, while SIG is required to prove actual malice (see below), even if a negligence standard were to apply, SIG's claim would fail because Bagnell exercised due care in creating the Animation. The Animation, made by an experienced professional animation firm, is based upon CT scans of an actual "pre-upgrade" P320, magnified photographs of actual P320s and their component parts, and the opinions of firearms and engineering experts as to the mechanism of failure that has caused some P320s to fire without a trigger pull. That is not negligent.

### 2. SIG's Defamation Claim Fails Under the First Amendment

More fundamentally, SIG ignores that "[t]he First Amendment . . . overlays state defamation law and imposes a number of constraints on a [defamation] plaintiff." *Sindi*, 896 F.3d at 13 (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)). "[A] public figure may recover for defamation only if [it] proves actual malice [i.e., knowledge that a statement is false or reckless disregard for the truth] by clear and convincing evidence." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974)). The actual malice requirement applies both to general public figures, whose "pervasive fame or notoriety" makes them "public figure[s] for all purposes and

in all contexts," and to limited purpose public figures, "who are public figures with respect to the limited range of issues surrounding the claimed defamation." *Id*.[13] And even private figures must show actual malice to recover presumed or punitive damages "for a defamatory statement involving a matter of public concern." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997). To prove actual malice, "[t]here must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth* of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

SIG is undoubtedly a public figure or, at the very least, a limited purpose public figure. SIG alleges that the P320 is "an iconic weapon in SIG's award winning line of handguns," which it supplies "to law enforcement, the U.S. military, and civilian customers." Compl. at 1, ¶ 5. SIG purports to be "one of New Hampshire's largest employers," and "operates an academy to train customers and others." *Id.* A host of national and local media outlets around the United States have covered the many incidents in which SIG P320s have fired without a trigger pull.[14] Further, SIG has affirmatively sought out media attention on these issues, including right after Bagnell's first lawsuit against SIG and right after SIG filed *this* lawsuit. Bagnell Aff. ¶15, 119 & Ex. 1&9. Based on these facts, SIG is at least a limited purpose public figure. And even if not, the safety of SIG's guns is clearly an issue of public concern. Therefore, the actual malice standard governs.

Under no circumstances can SIG establish that Bagnell published the Animation with actual malice. Bagnell worked painstakingly with an experienced professional animation design

---

[13] "[T]he vast majority of courts . . . have chosen to apply the *Gertz* public figure/private figure distinction to corporations in a manner that resembles as much as possible the application of *Gertz* to natural individuals." R. Smolla, 1 Law of Defamation § 2:96 (2d ed.); *see also id.* § 2.98; *Flotech, Inc. v. E.I. Du Pont de Nemours & Co.*, 814 F.2d 775, 780 (1st Cir. 1987) (applying actual malice standard to corporate plaintiff).

[14] As set forth in Mr. Bagnell's affidavit, the press regularly reports on lawsuits against SIG for weapon malfunctions. *See, e.g.*, Bagnell Aff. ¶ 19-20; https://www.goodmorningamerica.com/news/video/detective-sues-sig-sauer-holstered-p320-pistol-wounded-79633594; https://www.bagnell-law.com/news.

firm called High Impact, which has a national reputation for its high-quality animations

including prior experience creating an animation of a Taurus brand nine-millimeter pistol, to

create the Animation. Bagnell Aff. ¶42-44. The Animation is based upon CT scan images and

professional photographs of digital microscopy (some taken by one of SIG's own litigation

experts) of actual SIG P320s and their components. Bagnell Aff. ¶46, 54-56, 60, 93; Villani Aff.

¶13. The Animation depicts the mechanism by which the P320 can misfire without a trigger pull

according to the opinions of highly experienced and qualified firearms and engineering experts.

*See* Bagnell Aff. ¶55-57, 103, 107; Villani Aff. ¶6-24 & Exs. 1&2; Hicks Aff. ¶5-9 & Exs. 1&2.

Those efforts go far beyond what is required by the First Amendment. *Ryan v. Brooks*, 634 F.2d

726, 734 (4th Cir. 1980) (where "the sources of the [allegedly] libelous information appeared

reliable, and the defendant had no doubts about its accuracy, the courts have held the evidence of

malice insufficient to support a jury verdict").

### D.  SIG's Claim Under the New Hampshire Consumer Protection Act is Not Likely to Succeed

The New Hampshire Consumer Protection Act provides that "[i]t shall be unlawful for

any person to use any unfair method of competition or any unfair or deceptive act or practice in

the ***conduct of any trade or commerce within this state***." RSA 358-A:2 (emphasis added). While

the New Hampshire Supreme Court has not construed this language, this Court has held that "a

misrepresentation is made 'within this state' for purposes of the CPA 'whenever a person

receives a misrepresentation in the State of New Hampshire.'" *Fujifilm N. Am. Corp. v. M&R*

*Printing Equip., Inc.*, No. 20-CV-492-LM, 2021 WL 722861, at *8 (D.N.H. Feb. 24, 2021)

(McCafferty, J.). SIG does not allege that it was harmed because it received a misrepresentation

from Bagnell in New Hampshire. Rather, SIG's alleged harm is derivative of misrepresentations

allegedly received by SIG's actual and potential customers. But SIG makes no allegation and

presents no evidence that *any* actual or potential SIG customers in New Hampshire received and were affected by the Animation. Therefore, SIG's claim under the Consumer Protection Act fails. *See id.* (amended complaint futile where it "fails to specify where [the recipient] experienced the misrepresentations"); *BAE Sys. Info. & Elecs. Sys. Integration Inc. v. SpaceKey Components, Inc.*, No. 10-CV-370-LM, 2011 WL 1705592, at *6 (D.N.H. May 4, 2011) (McCafferty, J.) ("Where, as here, a plaintiff alleges offending conduct that took place outside New Hampshire, it fails to state a claim under the CPA."); *Mueller Co. v. United States Pipe & Foundry Co.*, No. Civ. 03–170–JD, 2003 WL 22272135 (D.N.H. Oct. 2, 2003) (dismissing CPA claim based on customer confusion created by trade-dress infringement because plaintiff did not allege that any consumer confusion took place in New Hampshire).[15]

### E.  The Requested Injunction Would Be An Unconstitutional Prior Restraint

"[T]he First Amendment forbids the government, including the Judicial Branch, 'from dictating what we see or read or speak or hear.'" *Sindi*, 896 F.3d at 30 (quoting *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002)). In *Sindi*, the First Circuit vacated a permanent injunction entered ***after a full jury trial and post-trial proceedings*** in which the Court found six specific statements to be defamatory, because the injunction could not "survive the strict scrutiny required to legitimate a prior restraint." *Id.* If an injunction entered after a full trial on the merits and post-trial fact-finding was vacated as an unconstitutional prior restraint, then the injunction that SIG requests here cannot withstand constitutional scrutiny. *See, e.g.*, *Exeltis USA Inc. v. First Databank, Inc.*, No. 17-CV-04810-HSG, 2017 WL 6539909, at *4 (N.D. Cal. Dec. 21, 2017) (denying preliminary injunction against allegedly false commercial speech "where there

---

[15] Further, the Animation does not constitute "trade" or "commerce" under the statute for the same reasons that the Animation does not constitute commercial speech or commercial advertising. *See supra*; *see also* N.H. Rev. Stat. Ann. § 358-A:1(II) (defining "trade" and "commerce").

has not yet been any determination on the merits that the speech is in fact false or misleading, and falsity is the key issue in dispute").

First, an injunction prohibiting the publication of the Animation, like the injunction in *Sindi*, would be "a paradigmatic example of a prior restraint," which "must survive the most exacting scrutiny" in the face of a "strong presumption that [the] prior restraint[] on speech [is] unconstitutional." *Id*. at 31-32 (quoting *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971)). Such a drastic remedy "may only be imposed when it furthers 'the essential needs of the public order,'" and those needs cannot be achieved through less restrictive means. *Id.* at 32 (quoting *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968)). Further, an injunction "must be precisely tailored both to meet the exigencies of the particular case and to avoid censoring protected speech." *Id*

As in *Sindi*, SIG's requested injunction is unconstitutionally broad. It would not only order Defendants to remove the Animation from any location over which they have control (including the Bagnell Firm's website and their YouTube channels) but would also prohibit the Defendants and their agents, ***including their attorneys***, "from any further publication or dissemination of the Animation to the public ***in any form, on any platform, on the internet or in any other media, or in any other way***." Proposed Order (Doc. No. 3-2 at 2) (emphasis added).

The breadth of that proposed order is extraordinary. Read literally, it could prohibit the Defendants' counsel from including the Animation or even referring to it in filings before this Court or in communications to the press to rebut SIG's meritless lawsuit. It could bar Bagnell from seeking to use the Animation as a demonstrative exhibit, including at the trial of the *Guay* matter before this Court later this year. The injunction could also prohibit Bagnell from publishing the Animation even if SIG later admits that the Animation is truthful. These examples

suffice to demonstrate that the requested injunction is impermissibly broad and the Court cannot,

consistent with the First Amendment, enter the requested injunction.

"The cardinal vice of the [requested] injunction . . . is its failure to make any allowance

for contextual variation." *Id*. "Refined to bare essence, it [would] enjoin[] [Bagnell] from

repeating certain words [and images], regardless of their purpose in employing them."

*Id.* "Consequently, the injunction [would] 'sweep[] . . . more broadly than necessary' by

prohibiting [Bagnell] from engaging in speech about a public figure 'before an adequate

determination that it is unprotected by the First Amendment.'" *Id.* at 33-34 (describing examples

in which injunction after defamation trial would sweep too broadly). "A decree that requires a

judicial permission slip to engage in truthful speech is the epitome of censorship" that offends

the First Amendment. *Id.* at 35. The Court cannot lawfully enter the proposed injunction.

## III.    **SIG Has Failed to Meet Its Burden of Showing Irreparable Harm**

SIG has not shown that it will be irreparably harmed without an injunction. First, SIG

alleges that the Animation was posted to YouTube on August 28, 2021. Compl. ¶ 16. But SIG

did not file its Complaint or Motion for Preliminary Injunction until March 2, 2022—over ***six***

***months*** later (and the same day this Court scheduled a trial in the *Guay* matter). That delay alone

is enough to deny the injunction. *See, e.g.*, *Doe v. Trustees of Dartmouth Coll.*, No. 22-CV-018-

LM, 2022 WL 1004210, at *3 (D.N.H. Apr. 4, 2022) (McCafferty, J.) (denying injunction

because plaintiff's "lack of urgency in litigating this motion further weakens his assertion that he

will suffer irreparable harm" where he filed suit two months after expulsion and agreed to an

injunction hearing two months after that); *Channing Bete Co., Inc. v. Greenberg*, No. 3:19-CV-

30032-MGM, 2021 WL 4691597, at *7 (D. Mass. July 12, 2021) ("If irreparable harm is

presumed from a finding that a plaintiff will succeed on the merits . . . [a]n exception exists when

plaintiffs are aware (or have reason to be aware) of the infringement, and do not bring suit; traditionally, plaintiffs' [unreasonable] delay in filing suit rebuts the presumption of irreparable harm to them, making preliminary injunctive relief inappropriate.") (quotations omitted).

Second, there is no reason that a damages award would be insufficient to remedy SIG's alleged harm. SIG will have an opportunity to prove whether it was harmed and, if so, the extent of that harm and to seek a damages award after a trial. An injunction is therefore unnecessary. Further, as explained above, (1) SIG cannot show literal falsity in the Animation, and (2) SIG is not likely to succeed on the merits of its false advertising claim. Therefore, SIG is not entitled to a presumption of irreparable harm under the Lanham Act. *See Cashmere*, 799 F.2d at 15; 15 U.S.C. § 1116(a). An injunction is therefore not warranted.

## IV.   Imposing an Unconstitutional Prior Restraint Would Substantially Harm Bagnell by Threatening His Very Livelihood

Make no mistake, SIG's goal in this lawsuit is to silence Attorney Bagnell and to drive him out of business. Apparently having concluded that fighting Attorney Bagnell fairly on the merits in the cases he has filed against SIG on behalf of clients is not working, SIG has taken the extraordinary step of *suing* the lawyer representing SIG's adversaries, seeking to silence him from speaking on the very issue being litigated in those cases.

SIG's tactics are transparent. And the harm to Attorney Bagnell is severe. Having to respond to this vexatious SLAPP suit is not only making it more difficult for Attorney Bagnell to litigate those cases on a daily basis, but, more importantly, if SIG obtains the requested injunction, it will seriously impair Attorney Bagnell's First Amendment right to speak publicly on this issue, including his right to respond to SIG's public accusations to defend himself and the fairness of the Animation. It will create a significant obstacle to raising awareness in the public of the serious safety issues plaguing the SIG P320. This SLAPP suit is nothing short of an effort

to destroy Attorney Bagnell's practice in this field. Bagnell Aff. ¶117-120.

By contrast, denying the injunction will cause no harm to SIG. SIG has *no* evidence of actual harm to it and any harm would be the result of SIG's own defective manufacturing and quality control processes. SIG is a large corporation with vast resources and access to media platforms from which it can publish its response to the Animation. Indeed, SIG has already done so via a defamatory press release about Attorney Bagnell. Bagnell Aff. ¶117 Ex. 9. The solution here is *more* speech, not less. *See Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("the remedy to be applied is more speech, not enforced silence").

## V.  The Public Interest Clearly Favors Bagnell and Disfavors the Requested Injunction

At its core, the purpose of the Animation is to convey a critically important message about public safety. The public interest in hearing messages bearing on public health and public safety is a weighty one. The only countervailing interest that SIG cites is avoiding false advertising. Mem. at 14-15. But there is nothing false about the Animation. It truthfully conveys important information about safety concerns with a lethal weapon made by SIG.

Fundamentally, SIG's lawsuit against Bagnell is a retaliatory lawsuit that is intended to undermine and ultimately eliminate Bagnell's core petitioning activity of bringing lawsuits on behalf of clients against SIG. SIG's aim is to distract Mr. Bagnell from the upcoming *Guay* trial, force him to prove his case months before he is ready, expose his work product in ways that would never be permitted in the underlying cases, force facts to be found on an incomplete record, exhaust his resources, diminish his reputation, and intimidate him for standing up to SIG. In sum, SIG's clear motive is to disrupt Bagnell's litigation of the underlying cases he has filed against SIG by seeking an injunction in this lawsuit. Bagnell Aff. ¶117-120.

But SIG cannot do indirectly what it could not do directly in the underlying litigation. The *Noerr-Pennington* doctrine protects petitioning the courts, including pre-litigation activities,

and protects lawyers who exercise the right to petition on behalf of clients. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965).[16] Bagnell would be immune from suit for using the Animation in the underlying litigation.[17] They would also be protected by the absolute privilege for statements made in the course of judicial proceedings. *See Pickering v. Frink*, 461 A.2d 117, 119 (1983) ("statements [pertinent to and] made in the course of judicial proceedings are absolutely privileged from liability in civil actions"); *see also McGranahan v. Dahar*, 408 A.2d 121, 122 (N.H. 1979); *Chamberlin v. 101 Realty, Inc.*, 626 F. Supp. 865, 871 (D.N.H. 1985) (citing *Sriberg v. Raymond*, 345 N.E.2d 882 (Mass. 1976)).

In short, the public interest—embodied in the policies underlying *Noerr-Pennington* and the absolute litigation privilege—would be significantly undermined if SIG could do indirectly what it cannot do directly.

## **CONCLUSION**

For the foregoing reasons, the Court should deny SIG's Motion for Preliminary Injunction.

---

[16] *See also Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 147 (1st Cir. 2000); *Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 100 (2nd Cir. 2000) (collecting cases); *Tomaiolo v. Mallinoff*, 281 F.3d 1, 11 (1st Cir. 2002) ("the courts have extended [*Noerr-Pennington*] to other federal statutes that provide causes of action so broad as potentially to chill the constitutionally protected right to petition the government"); *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184, 1186 (9th Cir. 2005) ("conduct incidental to a petition is protected").

[17] There is a "sham" exception to the doctrine, but the Supreme Court has held that "an objectively reasonable effort to litigate cannot be sham regardless of subjective intent." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57 (1993). Bagnell's efforts to litigate cases against SIG is not a "sham." Indeed, the *Guay* and *Schneider* cases are scheduled for trial later this year. Bagnell's *Vadnais* case settled on the second day of trial after the court denied SIG's summary judgment and *Daubert* motions from the bench. Bagnell Aff. ¶27. No "sham" litigation could get that far in a federal court.

Respectfully submitted,

JEFFREY S. BAGNELL, ESQ., LLC, and
JEFFREY S. BAGNELL,

By their attorneys,

*/s/ Joseph M. Cacace*
Joseph M. Cacace (NH Bar # 266082;
MA BBO # 672298)
Max. D. Stern (*pro hac vice*)
Howard M. Cooper (*pro hac vice*)
Lorraine Belostock (*pro hac vice* pending)
jcacace@toddweld.com
mstern@toddweld.com
hcooper@toddweld.com
lbelostock@toddweld.com
TODD & WELD LLP
One Federal Street
Boston, MA 02110
Tel: (617) 720-2626
Fax: (617) 277-577

Dated: April 15, 2022

## CERTIFICATE OF SERVICE

I, Joseph M. Cacace, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Joseph M. Cacace*
Joseph M. Cacace

Dated:  April 15, 2022