UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____
                                                    )
SIG SAUER, INC.                                     )
                                                    )
                    *Plaintiff,*                    )
                                                    )        Civil Action No.: 1:22-cv-00078
           v.                                       )
                                                    )
JEFFREY S. BAGNELL, ESQ., LLC, and                  )
JEFFREY S. BAGNELL,                                 )
                                                    )
                    *Defendants.*                   )
_____             )

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

Here, the truth matters. Now that the Bagnell Defendants have provided at least some information as to which specific gun components were "used" by them to create the Animation, it has become apparent that the purported "rollover" and deformation depicted on the face of the sear in the P320 shown in the Animation was actually an accumulation of a grease-like substance on the striker foot of one particular firearm in a photo taken during an examination in a lawsuit, apparently then cut from the photo of the striker foot and superimposed on the sear face (a different part) to make the Animation. Supplemental Affidavit of Sean Toner ("Toner Supp.") at ¶¶ 4-10. That grease was easily wiped away, revealing a flat surface. *Id.* at ¶ 9 (showing before and after photos). It was not any deformity in the part, and Defendants knew or should have known it, yet they are perpetuating that falsehood to this Court. Physical examination of that specific striker foot and sear, which presumably are still in Defendants' possession, will demonstrate that falsity.

This case is not complicated. Mr. Bagnell published and promoted an Animation on the internet containing literally false depictions of SIG's P320 pistol and making false written

1

representations about an alleged "mechanism of failure" in the gun that purportedly makes it susceptible to un-commanded discharges.  The Animation claims the P320's sear—a critical component in the firing of the gun—has an "inset surface" and "rollover condition" that can cause the gun to fire without a trigger pull, and it makes a host of other specific factual claims about the physical components of the firearm that are not only false but physically impossible.  *See* Docket Entry ("D.E.") # 3-3 (Affidavit of Robert Miller ("Miller Aff.") at ¶¶ 12-47.  The Animation risks irreparably harming SIG's reputation and brand.

Defendants' Opposition papers do not really dispute that their Animation is inaccurate.  First, Defendants actually concede that—notwithstanding the "CT scan" text in the opening frames—the Animation "is *not*, and does not purport to be, an exact copy or scale drawing of any particular P320." D.E. #22 at 6-7.  Even though the "whole point" of the Animation was to show "how a failure could happen," Defendants now take the position that the depiction of the parts allegedly involved in the purported failure need not be true.[1]  *Id.*

Second, Defendants do not deny that the Animation was the product of manipulation.  In his opening affidavit, Mr. Miller opined that, based on his experience, "the geometry shown in the Animation is not the product of typical wear or manufacturing defects, and instead would have to be the product of digital manipulation."  SIG cited this testimony in its brief.  D.E. #3-1 at 9 ("The Animation falsely depicts [the sear and striker foot] with deformed faces; the conditions purportedly shown are not the product of typical wear or manufacturing defects, and instead would have to be the product of digital manipulation.")  Remarkably, neither Mr. Bagnell nor Mr. Villani

---

[1] Defendants also disclose that the P320 images in the Animation did not come from a single gun, as SIG believed after viewing the Animation, but rather came from multiple P320s at issue in various other lawsuits.  Bagnell Aff., ¶ 60.  Defendants mixed-and-matched images of parts from different P320s to create the Animation—a fact which they fail to disclose in the Animation.

dispute that statement, and Defendants' brief simply ignores it.

Instead of engaging with the facts, Defendants throw up a lot of smoke, trying to turn this straightforward case into an argument about anything other than the truth or falsity of the Animation, lobbing personal attacks at SIG[2] and accusing SIG's expert, Mr. Miller, of intentionally falsifying images in his affidavit—*i.e.*, lying to the Court.  *See* D.E. # 22-1 (Bagnell Aff.) at ¶ 48 ("White lines appear to have been superimposed on the image …."); *id.* at ¶ 52 ("…it is Mr. Miller himself who manipulated and/or altered a photograph…."); *id.* at ¶ 53 ("…the image may have been sharpened using graphic editing software…."); D.E. # 22-11 (Villani Aff.) at ¶ 7 ("I observed important and disturbing visual discrepancies with some of those photographs….").  Mr. Miller emphatically denies those accusations entirely – he did not manipulate anything, and would happily provide the Court with the actual parts he photographed so the Court can see for itself that nothing was manipulated.  Supplemental Affidavit of Robert "Buzz" Miller ("Miller Supp.") at ¶¶ 6-7, 16-18.   Those allegations are a baseless distraction from the simple core of this lawsuit – Defendants' publication of commercial advertising on the internet containing literally false claims about SIG's product.[3]

---

[2] Rather than rush into court, SIG retained an expert to review the Animation and come to his own conclusion as to whether the Animation was true or false.  That process took some time. Over the same time, SIG saw that comments questioning the accuracy of the Animation were posted to YouTube and then subsequently deleted, indicating that Defendants were intentionally obfuscating the truth.  Having satisfied itself of the merits of its claims, SIG filed suit and sought a preliminary injunction.  SIG did not engage in any of the "conspiracy theory" conduct alleged by Defendants.  *See* D.E. # 22 at 3 (accusing SIG of bringing suit to distract Mr. Bagnell from preparing for trial, to make him prove his case before he is ready, to intimidate him, etc.). Contrary to Defendants' contentions, SIG did not unreasonably delay filing its claims. *See Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98-99 (D. Mass. 1996) (finding that an eight month delay was not unreasonable where the plaintiff spent that time actively preparing its case).

[3] Equally baseless are Defendants accusations that this lawsuit is an attempt to "silence" Mr. Bagnell, or to interfere with his right to petition. D.E. # 22 at 2. SIG believes as strongly in the

Cutting through Defendants' overheated rhetoric, the actual evidence offered by Defendants shows—as SIG expected—that the Animation **was** the product of manipulation and deception.   As explained below, the rounded, distorted image of the sear face depicted in the portion of the Animation describing the alleged "rollover condition" actually comes from a photograph of a striker foot face, a completely different part.   And the lumpy appearance on the striker foot is because of the presence of *grease*, not "excess material [that] SIG should have machined off" as Defendants claim in the Animation.   D.E. # 22-1 (Bagnell Aff.), ¶ 53.   The Animation superimposes the image of the grease-covered striker foot onto the sear face and rotates it 180 degrees, which makes it appear as if the engagement surface of the sear face has an "inset surface" and "rollover condition."   Pictures taken the same day, after the striker foot was cleaned, show a flat surface with clearly defined edges.   Toner Supp. at ¶ 9.   Mr. Bagnell was present during the inspection so knew or should have known that the "excess material" he alleges was just grease.   Toner Supp. at ¶ 10.   That is textbook manipulation.   And unlike Defendants' baseless allegations directed towards Mr. Miller, it is backed up by actual evidence.

Defendants kick up a lot of dirt in their opposition, but ultimately to no avail.   The Animation is literally false and risks irreparably harming SIG's reputation and brand.   Defendants' efforts to dodge liability for their own false statements and manipulation miss the mark.   The Court should grant SIG's motion.

---

First Amendment as it does the Second.  Defendants are free to express their personal views about SIG and its products, to represent clients in lawsuits against SIG, and to advertise their legal services.  But they cross a line when they engage in commercial speech on the internet that makes false representations of fact about SIG's products that risk irreparably harming SIG's goodwill and brand.  That conduct is unlawful, and SIG petitioning the Court to stop Defendants' unlawful conduct does not violate the First Amendment.

**ARGUMENT**

## I.    The Animation Contains Digitally-Manipulated Images With No Basis In Fact.

To make the Animation, according to Mr. Bagnell's Affidavit, the Bagnell Defendants

sent to their graphics vendor, High Impact, the following two photographs, which were used "to

develop the depiction of the rollover condition and mechanism of failure in the Animation."[4]

 

Both images depict the "face" of a P320 striker foot.[5]  *See* D.E. # 22-1 (Bagnell Aff.) at ¶¶ 55,

56.  Although Mr. Bagnell is apparently unable to determine which gun(s) these images came

from, he did narrow it down to a gun from one of four lawsuits against SIG. *Id.*  SIG has been

able to determine that the image on the left was taken of the gun at issue in the *Mayes* litigation,

and that the image on the right was taken of the gun at issue in the *Frankenberry* litigation.

Toner Supp. at ¶¶ 7, 12.

As discussed in the supplemental affidavit of Sean Toner (who, like Mr. Bagnell, was

present for the March 2021 inspection of the *Mayes* and *Frankenberry* P320s), the image on the

---

[4] Mr. Bagnell also claims to have provided High Impact an undisclosed number of "additional up-close photographs of P320 components" that he does not identify, as well as CT scan images of a pre-upgrade P320.  D.E. # 22-1 at ¶ 60.  Defendants have not provided any of that to the Court.

[5] Both images have been rotated by 90 degrees to show the orientation of the striker foot as it would be in the gun.

left shows a P320 striker foot containing a grease-like substance at the top of the vertical face just above where the striker foot engages with the sear notch.  Toner Supp. at ¶¶ 6-7. Photographs, taken during the inspection, document the physical appearance of the striker foot both *with the grease* and *without the grease*.  *Id.* at ¶ 7.  The photograph Mr. Bagnell provided to High Impact was taken before the grease was cleaned off the part.  What Mr. Bagnell refers to as "excess molding material" (D.E. # 22-1 at ¶ 55) is actually just grease, as shown in these before and after images taken at that inspection (which have been rotated 180 degrees to show the orientation of the striker as it would be in the gun):[6]



Although the image (on the left, below) provided by Mr. Bagnell to High Impact was of the grease-covered striker foot, the phantom contours created by the presence of the grease were superimposed in the Animation onto the face of the *sear*, and further modified to create the appearance of rounded deformation at the top of the sear, where engagement with the striker foot

---

[6] Mr. Bagnell also alleges that "excess material around [the] perimeter" is visible in the striker photographed as part of the *Frankenberry* inspection (D.E. # 22-1 at ¶ 56), but no such material is visible in the image.  To the contrary, the edge of the striker foot face appears to radius *away* from the vertical face, i.e., no "excess."

occurs (as can be seen when comparing the image sent by Mr. Bagnell with the Animation image side-by-side):

 

Defendants offer absolutely no photographic or other support for the deformed appearance of the sear engagement face. The images they have provided prove that the purported deformity was actually grease, and the grease was actually on a different part. Thus, on this record: (i) the image is literally false, (ii) the process used to create it was deceptive and misleading, and (iii) Mr. Bagnell's insistence that the surface shows "excess material" is contrary to the evidence. For these reasons alone, the Court should grant SIG's motion.

## II.   The Court Has Personal Jurisdiction Over Defendants.

Defendants attempt to avoid having to answer for their misrepresentations by alleging lack of personal jurisdiction. This gambit fails. First, jurisdiction is proper here because Defendants expressly made New Hampshire the "focal point" of their defamatory conduct. *See Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir. 1989) (finding New Hampshire had jurisdiction over D.C. residents who made allegedly defamatory statements about a New Hampshire resident to a D.C. newspaper because defendants "knew that release of the allegedly false information would have a devastating impact on [plaintiff], and it can be inferred that they intended the brunt of the injury to be felt in New Hampshire."). Defendants purposefully avail themselves of contact with

a forum if they "expressly aim" their defamatory conduct at a party there. *Calder v. Jones*, 465 U.S. 783, 789 (1983). Courts evaluate where defendants "expressly aim" their conduct by applying the "effects test", which simply asks where the effect of the defamation occurred based on the focal point of the defamatory conduct and where the plaintiff suffered harm as a result of the defamation. *Hugel* 886 F.2d at 4; *De Laire v. Voris*, 2021 U.S. Dist. LEXIS 63996, *7 (D.N.H Apr. 1, 2021) (finding that a defendant purposefully availed himself of contacts with New Hampshire when he published allegedly defamatory statements about a New Hampshire minister on a webpage because the article concerned the professional activities of the minister within New Hampshire and harmed the minister's reputation there, making New Hampshire the "focal point" of the alleged tort.).

Here, Defendants' defamatory statements against SIG target a company headquartered in New Hampshire that constitutes one of New Hampshire's largest employers. The defamatory conduct concerns New Hampshire-based activity, *i.e.*, SIG's design and manufacture of its P320 handgun. Harm to SIG's reputation and goodwill as a result of Defendants' defamatory conduct will be felt primarily in New Hampshire. Thus, Defendants have purposefully availed themselves of contact with New Hampshire by aiming their defamatory conduct towards SIG here.

Nor can Defendants claim that SIG's cause of action does not relate to Defendants' conduct targeting New Hampshire.  In the context of internet-based defamatory communications "relatedness is established if the defamatory communications were made available in the forum state and were viewed or apprehended there." *De Laire*, 2021 U.S. Dist. LEXIS 63996 at *6. The Court may presume that at least one individual in New Hampshire has actually viewed the Animation as "when the defamatory materials are publicly available to a sufficient number of people, the court may presume that at least one person, other than the plaintiff, viewed and

apprehended the defamatory nature of the communication." *Id.* at *6-7. At the time that SIG filed its complaint the Animation was widely available on YouTube and had been viewed more than 36,000 times there, and an unknown number of additional times on Defendants' website.

**III.    SIG Has Standing To Sue Defendants Under The Lanham Act.**

Defendants' standing argument is likewise without merit.  Under *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014) "to come within the zone of interests in a suit for false advertising under §1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales." SIG alleges exactly this sort of injury, namely that falsities contained in the Animation have or will damage its reputation and goodwill. Defendants' assertion that that SIG falls outside of the zone of interest protected by the Lanham Act because it and Defendants are not competitors is foreclosed by plain language of the Supreme Court's opinion in *Lexmark*, which stated that "a rule categorically prohibiting all suits by noncompetitors would read too much into the Act's reference to 'unfair competition'… [as] by the time the Lanham Act was adopted, the common-law tort of unfair competition was understood not to be limited to actions between competitors." *Id.*

Defendants' reliance on the *POM Wonderful* case is similarly misplaced. There, the Supreme Court merely noted that "competitors are within the class that may invoke the Lanham Act because they may suffer an injury to a commercial interest in sales or business reputation proximately caused by a defendant's misrepresentations" and defined the term "competitor" as used in that opinion to "indicate all those within the class of persons and entities protected by the Lanham Act." *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). That case did not purport to alter the "zone of interest" set forth in *Lexmark* by requiring some form of competition between the plaintiff and the defendant. *Id.*  While Defendants accurately note that

9

one court in the District of Arizona has interpreted *Lexmark* to require at least indirect

competition, *see ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*, 2020 U.S. Dist. LEXIS

4214, \*6-7 (D. Ariz. Jan 10, 2020), that interpretation contradicts the plain language of the

*Lexmark* decision, has not gained traction in other circuits, and has been criticized by other

district courts. *Roof Maxx Techs., LLC v. Rourk*, 2021 U.S. Dist. LEXIS 153487, 30-31 FN 2

(.S.D. Oh. Aug. 16, 2021) ("this Court believes that *ThermoLife* misread Lexmark and therefore

disregards this non-binding authority".); *Wyndham Vacation Ownership v. Reed Hein & Assocs.,*

*LLC*, 2019 U.S. Dist. LEXIS 140525, \*5 (M.D. Fla. Aug. 20, 2019) ("competition is not required

to bring a claim under the Lanham Act.").  In sum, SIG falls within the zone of interest protected

by the Lanham Act as it alleges "an injury to a commercial interest in reputation or sales." *See*

*Lexmark*, 572 U.S at 131.

## IV.     The Animation Is Commercial Advertising.

Defendants also seek to dodge liability for their misrepresentations by arguing that the

Animation is not "commercial speech."  They contend that expression qualifies as commercial

speech only if it relates *solely* to the economic interest of the speaker and its audience.  D.E. # 22

at 14.  But the very cases Defendants cite show they are wrong.  In the *Bolger* case, the Supreme

Court did refer to a "core notion of commercial speech" – i.e., "speech which does 'no more than

propose a commercial transaction.'"  But it went on to hold that mailings that "cannot be

characterized merely as proposal to engage in commercial transactions" nevertheless constituted

commercial speech.  *Bolger v. Youngs Drug Prods. Corp*, 463 U.S. 60, 67-68 (1983) ("The

mailings constitute commercial speech notwithstanding the fact that they contain discussions of

important public issues.").  The Court engaged in a context-specific analysis and determined that

the *combination* of particular factors present supported the lower court's finding that the

mailings were commercial speech. *See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 Fed. Appx. 251, 257 (4th Cir. 2017) (noting that the considerations highlighted by the Supreme Court and other courts are context specific).

Here, a context-specific analysis shows that the Animation is commercial speech. The Animation was featured prominently on Defendants' website, along with statements touting Mr. Bagnell's experience in litigating against SIG and providing potential clients with contact information. *See* D.E. # 3-1 at 7-8. The Animation appeared in close proximity to banner headlines promoting Mr. Bagnell's media appearances related to his handgun litigation. By any objective measure, that is commercial speech. Defendants ignore the surrounding content on the website and focus solely on the Animation, but that approach presents a myopic view. *See*, *e.g., Campfield v. Safelite Grp., Inc.*, 2016 U.S. Dist. LEXIS 197622, *17 (S.D. Ohio Sept. 30, 2016) (finding that video constituted commercial advertising, in part, because it was posted on defendant's website). Whether on YouTube or the website, the context surrounding the Animation (which the public would see first) communicates that the Animation is presented to promote Mr. Bagnell and his firm. That is classic lawyer advertising.

## V.     The Animation's Representations Are Neither Statements Of Opinion Nor "Substantially True" Statements of Fact.

In its motion, SIG identified ten specific factual representations that are demonstrably and literally false. Defendants make no effort to show that those statements are true. Instead, they seem to argue that those are all just opinion. Op. at 10. Defendants' argument has no merit.

If a representation is capable of being proven true or false, it is a representation of fact, not an opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990) (holding that an opinion is a statement that does not "contain a provably false factual connotation"); *McKee v.*

*Cosby*, 236 F. Supp. 3d 427, 438 (D. Mass. 2017). Here, each of the ten representations challenged by SIG (D.E. # 3-1 at 4) are capable of being proven true or false, including the physical features and characteristics of parts, the amount of space between those parts, and whether the striker foot can "walk off" the sear vertically. As demonstrated in Mr. Miller's Affidavit, all of these representations are false.  D.E. # 3-3 (Miller Aff.) at ¶¶ 12-47.  Defendants offer no *evidence* to the contrary.

The outcome is no different merely because Mr. Bagnell now attempts to recast the Animation as merely a "theory." D.E. # 22 at 9.  If the purpose of the Animation was to present an unsubstantiated "theory," the Animation could have—indeed, *should* have—disclosed that. Without such a disclosure, a reasonable person viewing the Animation would take away the message that statements and representations in it are facts, not opinions.  Nor is Defendants' analogy to trial demonstratives apt—in that context, the trial judge and the Federal Rules of Evidence serve as gatekeepers to prevent false or misleading material from being presented to the jury.  *See, e.g., Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 264 (1st Cir. 1993).  Similarly, Defendants cannot credibly argue that the Animation is "substantially true." For starters, as discussed above, they contend that Animation presents mere opinions, and they make no effort to show that the ten representations challenged by SIG are true facts.  Having proffered no evidence of truth, any argument that the challenged representations are "substantially true" is just conjecture.  Beyond that, Defendants' "excess material" claim—which they *concede* is a factual contention, not opinion (D.E. # 22 at 10)—has been shown to be untrue.  The "excess material" is just grease that was wiped away after the photograph was taken.[7]  Finally, as recognized in a

---

[7] Because Defendants knew or should have known that the "excess material" was grease, their argument that SIG cannot prove negligence or actual malice fails.  *See* D.E. # 22 at 18-20.

case relied upon by Defendants, a claim for defamation "can only rarely be dismissed on the rationale that the statements complained of are substantially true, as the notion of substantial truth necessarily implies a thread of untruth ...." *Thomas v. Tel. Publ. Co.*, 155 N.H. 314, 334 (2007).

## VI.   Defendants' Submission Underscores That The Factual Representations In The Animation Are Literally False.

A representation that is false on its face is literally false. *Clorox Co. v. Proctor & Gamble Commer. Co.*, 228 F.3d 24, 33 (1st Cir. 2000).  Here, the Animation conveys that the P320 is susceptible to un-commanded discharges because of the interaction of certain physical components in the firearm.[8]  The Animation opens with a CT-scan of a P320—suggesting that the images that follow are precise, accurate representations—and includes depictions of those parts in action.  Those depictions are used to support the express message that P320s are subject to a "defective discharge" with "no trigger pull."  In that context, the representation of the internal components is crucial to the overall message.  If the parts as depicted are not true to the *actual* parts of the gun, then the representations are literally false.

That is precisely the situation here.  First, the Animation claims that un-commanded discharges can occur in the P320 because the striker foot is capable of vertically "walking off" the sear.  But the actual physical tolerances of the gun make this assertion false on its face.  In order for the striker foot to walk off the sear, the slide and the rail (two physical components) would have to occupy the same space at the same time, which is physically impossible.  Indeed,

---

[8] The Animation also does not disclose that the P320 depicted is a pre-upgrade version of the gun, leaving viewers to believe that the P320 depicted is the version currently on the market.  For purposes of this motion, however, the Court need not rely on this additional false representation.  There is ample evidence of literal falsity regardless of which version of the gun is depicted.

Defendants' own submission proves this falsity.  Exhibit 5 to the Villani affidavit shows Mr.

Villani demonstrating the vertical movement of the slide and the frame.  Even when the vertical

space between these two components is at its maximum, and no matter how hard Mr. Villani

tried in the video, the sear and striker foot remain engaged.  Miller Supp. at ¶ 12. This

demonstration by Defendants' own expert corroborates the impossibility of the striker foot

"walking off" the sear. *Id.* at 13.

Second, as discussed above, Defendants' own affidavits demonstrate that the Animation

contains a manipulated image of the sear face.  The lumpy appearance of the sear with an alleged

"inset surface" and rounded edges has no basis in fact.  The only "evidence" Defendants offered

is a photograph of a grease-covered striker foot that falsely creates the impression of an irregular

surface. To make the Animation, someone apparently took the image of the grease-covered

striker foot and superimposed it onto the sear face to show a rollover condition that does not

exist.[9] In contrast to the rounded, deformed sear face depicted in the Animation, photos taken in

March 2021, *after the grease was cleaned off the part*, show a flat, non-deformed surface that

looks nothing like what is depicted in the Animation. Toner Supp. at ¶¶ 4-10.

These literally false representations are crucial because, as SIG argued in its opening

brief, their presence leads to a presumption of consumer deception.  D.E. #3-1 at 11.  Moreover,

because they relate to inherent characteristics of the P320, they are material as a matter of law.

*Id*. at 10-11.

VII.    **Issuance of a Preliminary Injunction Would Not Be a Prior Restraint**

---

[9] Even if someone other than Mr. Bagnell did the digital manipulation, Defendants knew or
should have known of it as Mr. Bagnell was present during the inspection when the grease was
wiped away from the part.  Toner Supp. at ¶¶ 6-10.

Issuance of a preliminary injunction here would not raise First Amendment concerns. First, as explained by the Supreme Court and this Circuit, "commercial speech may not be subject to prohibition against prior restraints." *In re San Juan Star Co.*, 662 F.2d 108, 115 (1st Cir. 1981) *citing Virginia State Bd. of Pharmacy v. Virginia Citizens Council*, 425 U.S. 748, 771-72 n.24. False advertising receives no First Amendment protection whatsoever. *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 558-59 (1980). Defendants' reliance on *Sindi*, is misplaced as that case did not concern commercial speech. *See Sindi v. El-Moslimany*, 896 F.3d 1, 11 (1st Cir. 2018).

Even if the Court were to engage in a prior restraints analysis, the preliminary injunction sought by SIG is in fact narrowly tailored. In support of its contention that commercial speech may be entitled to a prior restraint analysis, Defendants cite a single unpublished decision from the Northern District of California, which found a preliminary injunction improper where that injunction would not allow for alternative avenues of communication. *Exeltis USA Inc. v. First Databank, Inc.*, 2017 U.S. Dist. LEXIS 210482, *14 (N.D. Ca. 2017). Here, SIG seeks only to remove the false Animation from public circulation. Defendants will remain otherwise free to express their opinions about SIG's products.

## <u>CONCLUSION</u>

For the forgoing reasons, SIG Sauer respectfully requests that this court grant its motion for a preliminary injunction and order the Bagnell Defendants to remove the Animation from the internet and to stop publishing the Animation to the public on any platform or medium.

Dated:  April 25, 2022

Respectfully submitted,
SIG Sauer, Inc.

By its attorneys,
*/s/ Neil Austin*
Anthony D. Mirenda (*pro hac vice*)
K. Neil Austin (*pro hac vice*)
Stephen K. Garvey (*pro hac vice*)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
Telephone:  617-832-1000
Facsimile:  617-832-7000
amirenda@foleyhoag.com
naustin@foleyhoag.com
sgarvey@foleyhoag.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of this document, which was filed via the Court's ECF system, will be sent electronically by the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Neil Austin
Neil Austin (BBO # 657204)

Dated: April 25, 2022